Courier Citizen Company *vs.* Commissioner of Corporations and Taxation & another.[1]

Suffolk. December 9, 1970. — January 20, 1971.

Present: Tauro, C.J., Spalding, Cutter, Reardon, & Quirico, JJ.

*Taxation*, Sales tax, Exemption, Printing business. *Words*, "Directly."

Where the proprietor of a "fully integrated" printing business whose operations included all stages of the manufacture of finished printed material for customers purchased various items of machinery and materials for use in making, in connection with particular printing jobs, "composition" plates which were installed on the presses and normally were scrapped after the pressruns, such purchases were exempt from the sales tax under G. L. c. 64H, § 6 (r) or § 6 (s).

Bill in equity filed in the Supreme Judicial Court for the county of Suffolk on December 19, 1969.

The suit was reserved and reported, without decision, by *Cutter*, J.

*Harold Hestnes* (*Norman G. Stone* with him) for the plaintiff.

*William E. Searson, III*, Assistant Attorney General (*Walter H. Mayo, III*, Assistant Attorney General, with him), for the Commissioner of Corporations and Taxation & another.

*John Dane, Jr.*, & *Mark A. Michelson* for Associated Industries of Massachusetts & others, amici curiae, submitted a brief.

---

[1] The other defendant is the State Tax Commission.

CUTTER, J. The plaintiff (Courier) sought declaratory relief in the county court concerning its liability for sales tax (G. L. c. 64H) on its purchase of certain machinery, equipment, and supplies, "used directly" by it in its "fully integrated" printing business. The single justice reserved the matter, without decision, for the determination of the full court on the pleadings [2] and statements of agreed facts, which amount to a case stated. The general question presented is whether particular items of materials, machinery, and replacement parts are exempt from sales tax under subsecs. (r) and (s) of c. 64H, § 6 (as amended through St. 1968, c. 711, § 1). These provisions are set out in the margin. [3]

Courier manufactures in Massachusetts printed material upon orders from its customers. Its operations include every stage of manufacture from receipt of original "copy" of many types "through the pressrun and binding of . . . finished products." Courier makes in its own plants various types of printing plates. These plates, when treated with ink, are used to transfer to paper (through the operation of printing presses) the image to be printed. Such plates are often referred to as "composition." Courier uses principally two types of composition, viz. (a) photo-offset plates and (b) molded printing plates.

A. The manufacture of a *photo-offset plate* involves (1) photographing the original copy with an offset camera; (2) processing the film to produce a "flat" containing the composite image to be printed, and superimposing that "flat" upon, and affixing it to, a thin plate treated with a

---

[2] The defendants' answer admits all allegations of fact in the bill.

[3] Section 6 reads in part, "The following sales and the gross receipts therefrom shall be exempt from the tax imposed by this chapter. . . . (r) Sales of materials, tools and fuel, or any substitute therefor, which become an ingredient or component part of tangible personal property to be sold or which are consumed and used directly . . . in an industrial plant in the process of the manufacture of tangible personal property to be sold, including the publishing of a newspaper . . . . (s) Sales of machinery, or replacement parts thereof, used directly . . . in an industrial plant in the manufacture, conversion or processing of tangible personal property to be sold, including the publishing of a newspaper . . . ." See later amendments of other portions of § 6, by St. 1970, c. 566, § 7, and c. 597.

light-sensitive emulsion; (3) exposing the plate to a high intensity lamp; and (4) treating the exposed plate with chemicals to make image areas ink receptive and nonimage areas ink repellant, after which the plate is coated to protect it, and mounted on the plate cylinder of a printing press.

B. *Molded printing plates* are used on high speed presses for the production of high volume items such as newspapers and telephone directories. Manufacture of this type of plate involves (1) setting the original copy in lead type by linotype or monotype; (2) producing from the pages of assembled type a plastic nonflexible relief image molding mat; and (3) making from this molding mat a flexible raised image plate which is installed on the press.[4]

Both photo-offset plates and molded printing plates, with rare exceptions, are scrapped after the pressrun. Once removed from the press, they cannot be reused without adversely affecting the quality of the printed product.

The present controversy arose in the following manner. On May 23, 1968, the Department of Corporations and Taxation notified Courier of its intention to assess a deficiency in sales taxes for a period prior to May, 1968, amounting to $112,129.99, plus interest and penalties. Courier requested a ruling whether "[a] purchases by a printer, and other manufacturers of composition, of machinery and replacement parts therefor, used for the manufacture of composition, and [b] purchases of materials and supplies used and consumed in the manufacture of composition, [are] exempt under the Sales and Use Tax." The Commissioner ruled that the exemptions under § 6 (r) and § 6 (s), see fn. 3, *supra,* "apply only to materials . . . or machinery . . . 'used directly' in 'the process of the manufacture' or in the 'manufacture' of 'tangible personal property to be sold.' Since the machinery and materials are . . . used [by Courier and other similar concerns] to produce composition for the

---

[4] The several steps of each process are more fully outlined in Appendix A to this opinion. The appendix describes items of machinery, equipment, or materials used in each step and their ultimate disposition, and refers to the section of the sales tax statute (G. L. c. 64H) under which Courier contends its purchase of each item is exempt from tax.

manufacturer's own use, it is not used directly in the manufacture of any tangible personal property to be sold." [5] The Commissioner proposes to assess to Courier sales taxes with respect to its purchases of machinery and replacement parts used, and of materials and supplies used and consumed, in the manufacture of composition.

Courier contends that machinery used at any stage of an integrated printing process is "used directly . . . in the manufacture . . . of tangible personal property to be sold" within the meaning of c. 64H, § 6 (s).[6] See fn. 3, *supra*. The Commissioner's ruling would deny the statutory exemption to purchases of photo-offset cameras, linotype and monotype machines, and photo-composing machines (see Appendix A), even though they are used in a continuous production flow of which the end product (printed material) is to be sold.[7]

[5] The ruling proceeds, "The property being sold is printing matter. The composition used on the printing presses is used directly in the manufacture of such goods. Therefore, any material which becomes an ingredient or component part of the composition is exempt. However, the machinery used and materials used and consumed in making such composition is indirectly used in manufacturing printing matter and is, thus, not exempt."

[6] It is also Courier's contention that materials, tools and fuels so used are within the comparable language of § 6 (r). For convenience, we discuss the issues primarily under § 6 (s). See *Wakefield Ready-Mixed Concrete Co. Inc.* v. *State Tax Comm.* 356 Mass. 8, 9, n. 3. In this discussion, we deal with the fundamental issue whether the transaction was subject to § 6 (r) or § 6 (s), and see no occasion to discuss mechanics of the imposition of the excise, such as the use of resale and exempt use certificates. See G. L. c. 64H, § 8, inserted by St. 1967, c. 757, § 1, especially subsecs. (b) and (d), and also subsecs. (f) to (i), inclusive, inserted by St. 1968, c. 89, § 1. See 1968 House Doc. No. 142, p. 8.

[7] Courier refers us to Massachusetts Sales and Use Tax Regulation No. 18, Machinery Exemption (effective December 1, 1968), see 13 Boston Bar J. No. 4, p. 27. This was not incorporated in either statement of agreed facts. See *Finlay* v. *Eastern Racing Assn. Inc.* 308 Mass. 20, 26–28. Although we need not take judicial notice of the regulation, we may refer to it in view of the defendants' concession that Courier's quotations are accurate. See *Commonwealth* v. *Minicost Car Rental, Inc.* 354 Mass. 746, 747. It affords slight assistance, not only because it took effect on December 1, 1968, but also because it is no less ambiguous than the statute. Pertinent portions of Reg. No. 18 read: "(2) Machinery is 'used directly' when it is employed (a) to effect a physical change in tangible personal property during a manufacturing, converting, or processing operation, the finished product of which is to be sold . . . . (3) 'Industrial plant' means a business establishment primarily engaged in a process of manufacturing, converting, or processing of tangible personal property for sale in the regular course of business and generally recognized as such. (4) 'Manufacturing . . .' means an operation or series of operations whereby through the application of machines and labor to raw or semi-processed materials, . . . at any stage of becoming finished tangible personal property, the form or composition of the material or materials is significantly changed."

We reject the suggestion in the Commissioner's ruling (see fn. 6, *supra,* and related text of this opinion) that printing plates and other forms of composition are made for the "manufacturer's own use." The plates are not reusable tools, for they normally are discarded after the pressrun. They have no purpose except in connection with a particular printing job. They are made as the necessary first stage of a long process, culminating in a specifically ordered finished printed product. The Commissioner's ruling thus appears to rest only upon the circumstance that the typesetting, photographic, and other machinery and various materials employed in making the plates are not at any time placed immediately in contact with any material going into the finished product.

Sections 6 (r) and 6 (s) were recognized early in the history of the sales tax as being difficult of interpretation. See Dane, The New Sales and Use Tax Law, 51 Mass. L. Q. 239, 258,[8] where it was said in 1966, "Massachusetts belongs to the minority of sales tax states which excludes sales of machinery and replacement parts. However, to qualify for such exclusion, the machinery must be used directly in one of the specified activities listed above in connection with the exclusion of materials, tools and fuel. . . . While this exclusion is highly desirable to promote industrial expansion in the state and to prevent the removal of industry to other states granting this exclusion, it is anticipated that serious problems will arise in the interpretation of the words 'used directly.' "

The same article points out (p. 255) that a "retail sales tax . . . is a levy on consumer expenditures" and "not a turnover tax imposed at each step of the production and distribution process." This purpose to tax only ultimate sales

[8] The author of this 1966 article (who served, see 51 Mass. L. Q. 239, as special consultant to the Governor in connection with the preparation of sales tax legislation) has joined in filing in the present case an amicus brief in behalf of Associated Industries of Massachusetts and of several large manufacturers who purchase machinery and materials "used to make dies, production fixtures, jigs, patterns, composition or" other objects required in their respective manufacturing processes for purposes analogous to Courier's purpose in its manufacture and use of composition now under discussion.

at retail explains why the term "Sale at retail" is defined in § 1 (13) as "a sale of tangible personal property *for any purpose other than resale in the regular course of business*" (emphasis supplied). This definition and the provisions of c. 64H, §§ 3 (as amended by St. 1967, c. 797, § 2; see later revision by St. 1970, c. 683), 5, 8, and 23, all indicate the legislative intention to have the sales tax passed on to the final retail consumer, even though the registered vendor must pay the excise in the first instance (see, however, third sentence of fn. 6, *supra*) and even though the "incidence" of the tax (despite its reimbursement to the registered vendor) has been ruled to be on the registered vendor, at least in situations where Federal immunity from State taxation is not involved. See *Supreme Council of the Royal Arcanum* v. *State Tax Commn. ante*, 111, 112–113. See also Barrett and Bailey, Taxation (1970 supp.) §§ 1310–1312, 1320, 1339–1340, where (§ 1310) the purpose of excluding sales for resale is said to be "to avoid pyramiding the sales tax upon successive buyers and sellers." See also Due, Retail Sales Taxation in Theory and Practice, 3 Natl. Tax. J. 314, 317–318, 322.

The effect of the Commissioner's ruling is to impose a sales excise at a pre-retail stage of the production of the ultimate product, viz. the printed material. The amici curiae (fn. 8) point out that a tax so imposed inevitably enters into the cost of the final product to be sold at retail, and that the tax is subject to the normal mark-up on final resale just as much as any other cost. The cost of such a tax to the consumer is hence greater than the amount of revenue collected by the government.

The amici also argue that, if Courier (instead of producing the plates itself) had bought them from a supplier, the purchase would have been exempt from sales tax under c. 64H, § 6 (s), as "replacement parts" for machinery, i.e. the printing presses (to which the plates are attached), "used directly . . . in an industrial plant in the manufacture . . . of tangible personal property to be sold." This, the amici say, results (if the Commissioner's position is correct) in a

discrimination against integrated producers, and tends to repel integrated industry (with such industry's employment opportunities) from Massachusetts.

Our own cases do not resolve the present controversy concerning an ambiguous statute. In *Wakefield Ready-Mixed Concrete Co. Inc.* v. *State Tax Commn.* 356 Mass. 8, 10–12, we said (a) that the "legislative history affords no assistance in the interpretation of § 6 (s)"; and (b) that the "purpose of § 6 (r) and § 6 (s) is to exclude entirely certain items from the impact of the sales . . . tax on the basis of the nature of the items." Consequently, we regarded these provisions as not being "the type of exemption concerning which a special burden rests upon a taxpayer, claiming the benefit of the provision, to bring himself within its scope," i.e. there is no requirement that this type of exemption be interpreted narrowly.[9] The present issues did not then arise.

The parties thus rely in large measure on cases in other States. These decisions interpret and apply statutory provisions by no means precisely the same as the Massachusetts statute.

The Commissioner places principal emphasis on cases from Ohio which take a narrow view of the word "directly." *Fyr-Fyter Co.* v. *Tax Commr.* 150 Ohio St. 118, 124 (under a statutory exemption of goods used "directly in the production of tangible personal property for sale by . . . mining," fire-protection and safety equipment and certain motor vehicles were held subject to tax). *Jackson Iron & Steel Co.* v. *Tax Commr.* 154 Ohio St. 369, 373 (coal produced in a taxpayer's mines for use in the manufacture of pig iron for sale was held not exempt). *Youngstown Bldg. Material & Fuel Co.* v. *Tax Commr.* 167 Ohio St. 363, 367–368 (the court declined to recognize as part of an "integrated plant" the machinery used in bringing together the ingredients of mixed

---

[9] We went on to say (at p. 12), "The subsections are merely part of the statutory definition of the types of sales and uses of tangible personal property which are to be employed in measuring the excises and of those which are not so to be used. We perceive no legislative intention that there should be any such restrictive interpretation of subsecs, (r) and (s) as that for which the commission contends."

concrete and held only machinery used in actual mixing to be subject to exemption under a statute exempting property used or consumed "directly in the production of tangible property for sale by manufacturing, [or] processing"). [10]

Other cases point in a somewhat different direction. In *United Aircraft Corp.* v. *Tax Commr.* 145 Conn. 176. 183–184, "jigs, dies, and fixtures," were "not incorporated in the end product" but were "used up in the process of manufacture" and became "practically worthless." These were held within a Connecticut exemption of materials "consumed and used directly . . . in an industrial plant in the . . . manufacture of . . . property to be sold." A similar result was reached (pp. 185–186) with reference to X-ray films and chemicals used in testing metal parts before delivery. In *Hudson Pulp & Paper Corp.* v. *State Tax Assessor,* 147 Maine, 444, 446, 449–450, the statute exempted property "consumed . . . in the manufacture of . . . property for later sale." The statute was held to refer "to all those things which may be consumed . . . in the process of manufacture, whether or not they be those things which . . . are acted upon therein and thereby." Lubricating oils and felts used on paper machines thus were held exempt. In *Androscoggin Foundry Co.* v. *State Tax Assessor,* 147 Maine, 452, 456–457, molding sand, refractories, fire clay, steel shot and grit, and crucibles used in an iron foundry were held exempt. In *Bonnar-Vawter, Inc.* v. *State Tax Assessor,* 157 Maine, 380, 390, printing plates, not physically destroyed but stored against further use and orders, were held not within an exemption of property " 'consumed or

---

[10] See *General Motors Corp.* v. *Tax Commr.* 169 Ohio St. 361, 362 (tools purchased for use in producing dies, to be used in stamping automobile parts, held not exempt); *Ohio Stove Co.* v. *Tax Commr.* 171 Ohio St. 484, 485 (machines used in producing sand molds, in which metal castings are made, held not exempt). See also *Warren Tel. Co.* v. *Tax Commr.* 173 Ohio St. 164, 165. Cases dealing with fuel include *State* v. *Cherokee Brick & Tile Co.* 89 Ga. App. 235, 242 (gas used to produce heat which in turn was used to produce brick products held not directly used in processing those products), and *Phillips & Buttorff Mfg. Co.* v. *Carson,* 188 Tenn. 132, 140–142 (coal and fuel oil, used to generate steam which in turn was used to operate certain machinery, were not exempt as "industrial materials for . . . conversion into articles . . . for resale" or as "materials . . . used directly in . . . processing such materials").

destroyed' in the manufacturing process." Courier's plates, however, ordinarily cannot be reused.

Perhaps the case which most strongly supports Courier's position is *Niagara Mohawk Power Corp.* v. *Wanamaker,* 286 App. Div. (N. Y.) 446, affd. 2 N. Y. 2d 764, where the court interpreted a county sales tax exempting sales of tangible personal property "for use or consumption directly and exclusively in the production of tangible personal property to be produced for sale by manufacturing [or] processing." Tangible personal property was defined as including electricity. The power company in its generating plants used coal and ash handling equipment and various structures to house the machinery. In considering whether this equipment was exempt under the tax resolution, the court said (286 App. Div. [N. Y.] 446, 449), "There is no simple test of what constitutes 'consumption directly and exclusively in the production' of electricity. The basic questions are the following: (1) Is the disputed item necessary to production? (2) How close, physically and causally, is the disputed item to the finished product? (3) Does the disputed item operate harmoniously with the admittedly exempt machinery to make an integrated and synchronized system?" In holding the coal and ash handling equipment to be within the exemption, the opinion said (at p. 449), "That equipment is as essential to production as the generator itself. A serious breakdown in it would quickly stop or impair the output of electricity. We are further impressed with the synchronization and integration of the boiler and coal and ash equipment. The one could not operate without the other. Working together they make up a system which supplies the power from which electricity is produced. A taxing statute should receive a practical construction . . . . That is particularly true here, for the resolutions are designed to achieve a practical, economic result — avoidance of multiple taxation, at least to some extent. It is not practical to divide a generating plant into 'distinct' stages. It was not built that way, and it does not operate that way. The words 'directly and exclusively' *should not be construed to require*

*the division into theoretically distinct stages of what is in fact continuous and indivisible"* (emphasis supplied).[11]

Courier also refers us to various administrative rulings or regulations in other jurisdictions which, on varying language, support a somewhat broader interpretation of statutes generally comparable to the provisions of § 6 (s), than has been adopted by the Ohio courts with respect to the Ohio statute.[12]

The authorities from other States do not seem to us conclusive. We think the Ohio cases are too restrictive in their interpretation of the term "directly in the production of tangible personal property for sale." The language quoted above from the *Niagara Mohawk Power Corp.* case (286 App. Div. [N. Y.] 446, 449) reaches a more realistic result. The integrated process of modern printing cannot reasonably be reduced to fragments or segments. When a lawyer sends a typewritten brief to be printed, the process normally will begin with setting type on a linotype machine. If the brief has illustrations, it may be necessary to prepare engravings

---

[11] With reference to the structures, it was said: "The structures and supports which house and steady the machinery are essential to production. They are physically annexed to the machinery, specially designed therefor, and necessary to the proper functioning thereof. As a whole, the plant is a producing unit. The structures do not play as active a role as, for example, the turbine. But activity is not the test of directness. The walls of the boiler have a 'passive' function in one sense. The important thing is that all parts of the plant contribute continuously and vitally to production, and they are all integrated and harmonized."

[12] Kentucky Rev. St. § 139.480 (8) exempts certain new machinery. Regulation SU–6–1, and Circular SU–30 under it (1968 C.C.H. State Tax Reporter, Ky., pars. 38 – 506, 38 – 863), exempt, for newspaper publishers, photo laboratory activities, the production of engravings, printing composition and its production, plate making. New York has ruled (Op. 1968, N.Y. T.B. v. 1, p. 70. 1969 C.C.H. State Tax Reporter, N. Y. par. 99–150) that included in exempt "[m]achinery or equipment for use or consumption directly and exclusively in the production of tangible personal property . . . for sale by manufacturing" are items purchased by newspaper publishers, such as stereotype matrices, unexposed offset plates, and unexposed photoengraving plates. Pennsylvania Stat. Ann. Tit. 72, § 3403–2 (c) defines "manufacture" as including processing "for sale or use by the manufacturer," and also the "[p]ublishing of books . . . or other . . . printing." Under Reg. 225 (1969 C.C.H. State Tax Reporter, Pa., par. 63–621), the manufacturing exemption covers purchases of "property . . . predominantly used directly . . . in manufacturing . . . operations." One factor to be considered in "determining whether property is directly used" is the "active causal relationship between the use of the property in question and the production of a product."

or offset plates. Each step is as direct a step in the production process as the actual printing after the insertion of assembled pages of type in a printing press. The linotype and the machinery used in preparing plates we think are directly used in production. Any other interpretation runs counter to the plain statutory purpose to tax only the sale of the end product.[13]

We hold that each of the items listed in Appendix A as one where exemption is claimed under § 6 (s) is within the exemption thereby provided. What has been said with respect to machinery and equipment used in producing composition and in "pre-press preparation," by a parity of reasoning applies also under § 6 (r) to film, chemicals, emulsion, ingredients of plates, and similar materials used directly in such pre-press preparation.

The case is remanded to the county court for the entry of a decree declaring the rights of the parties in accordance with this opinion.

*So ordered.*

APPENDIX A

The parties have agreed to the following description of the pertinent procedures employed by Courier in its manufacturing operations.

A. The steps involved in the manufacture of *photo-offset plates* and the items purchased by the plaintiff necessary to the completion of each step and the statutory provisions which the plaintiff contends exempt the purchase from tax are set out in the table below together with a statement of what occurs to each item during each step of the manufacturing process:

| Step | Items Purchased | Section of Statute (G.L. c. 64H) | Disposition of Item |
|------|-----------------|----------------------------------|---------------------|
| 1) Taking photograph of original copy | Camera | 6(s) | This machine has indefinite reuse |
| | Film | 6(r) | Discarded following step 3 below |

---

[13] Our conclusion, consistent with some administrative results elsewhere (fn. 12), may be supported in some degree by the provision (see fn. 3, *supra*) found both in § 6 (r) and § 6 (s) expressly placing within the manufacturing exemption "the publishing of a newspaper." It seems unlikely that there was a legislative intention to separate the ultimate printing by rotary presses from the linotype composition and the preparation of the plates placed upon those presses without which the newspaper could not be produced or have any value. Newspaper printing cannot reasonably be viewed as a more integrated process than other forms of commercial printing.

Courier Citizen Co. *v.* Commissioner of Corporations & Taxation.

| Step | Items Purchased | Section of Statute (G.L. c. 64H) | Disposition of Item |
|---|---|---|---|
| 2) Processing of film to form a negative or positive "flat" which contains the composite image to be printed | Developing Chemicals | 6(r) | Disposed of following completion of this step |
| 3) Negative or positive "flat" containing the composite image to be printed is positioned over a thin plate usually made of zinc, aluminum, steel or in some cases paper or plastic, which is surface treated with a light-sensitive emulsion. The plate is then exposed to an arc lamp of high intensity. | Photo-composing machine | 6(s) | Machine has indefinite reuse |
|  | Emulsion | 6(r) | Disposed of after this step |
|  | Plate * (Note 1) | 6(r) & 6(s) | Discarded after pressrun |

(Note 1 — The Commissioner has ruled that the materials which are an ingredient or component part of a plate are exempt).

| Step | Items Purchased | Section of Statute (G.L. c. 64H) | Disposition of Item |
|---|---|---|---|
| 4) Developing of exposed plate by treating it in chemical solution which makes image areas ink receptive and non-image areas ink repellant. Development is accomplished by placing plate in tank containing mechanical agitator. | Chemical solution | 6(r) | Discarded after this step |
|  | Development tank and agitator | 6(s) | Machine has indefinite reuse |

The finished plate is discarded following its removal from the press after the pressrun.

B. The steps involved in the manufacture of a *molded printing plate* and the items purchased by the plaintiff necessary to the completion of each particular step and the statutory provisions which the plaintiff contends exempt the purchase from tax are set out in the table below together with a statement of what occurs to each item during each step of the manufacturing of *molded printing plates:*

| Step | Items Purchased | Section of Statute (G.L. c. 64H) | Disposition of Item |
|---|---|---|---|
| 1) Original copy is set in lead type by use of a linotype or monotype machine. These machines produce raised impression characters out of molten lead which are then assembled into lines and page size forms. | Linotype or monotype machines | 6(s) | Machine has indefinite reuse |
|  | Lead ingots | No exemption claimed | Has physical life of 176 years and is subject to constant reuse through remelting and refining |

Norwell *v.* Hartford Accident & Indemnity Co.

| Step | Items Purchased | Section of Statute (*G.L. c. 64H*) | Disposition of Item |
|---|---|---|---|
| 2) The standing lead forms are covered with a heating setting plastic which | Heat pressure molding machine | 6(s) | Machine has indefinite reuse |
| is applied with pressure resulting in the production of a non-flexible relief image molding mat. | Plastic compound | 6(r) | Discarded after step 3 below |
| 3) The relief image mat is then covered with a liquid plastic compound such as daxene. Pressure | Heat pressure molding machine | 6(s) | Machine has indefinite reuse |
| and heat are then applied which produces a raised image plate which is the final print medium installed on the press. | Daxene | 6(r) | Discarded in the form of the plate following completion of pressrun |

Molded printed plates are discarded after removal from the press following the completion of the pressrun.