ROWE CONTRACTING CO. *vs.* STATE TAX COMMISSION.

Suffolk. January 3, 1972. — February 11, 1972.

Present: CUTTER, REARDON, QUIRICO, BRAUCHER, & HENNESSEY, JJ.

*Taxation,* Sales and use tax, Quarry, Industrial plant. *Words,* "Conversion or processing."

In St. 1966, c. 14, § 1, subsections 6 (r) and 6 (s), each of which exempt certain transactions from sales and use tax, the respective phrases "in the process of the manufacture of tangible personal property to be sold" and "in the manufacture, conversion or processing of tangible personal property to be sold" are essentially interchangeable and are to be given the same meaning. [162]

In the case of a taxpayer engaged in the business of producing for sale crushed stone, manufactured gravel and treated stone, it was held that the taxpayer's processing activities began with the severing of rock from the real estate by means of blasting and that subsequent steps, including the collection of the blasted rock and transporting it to the quarry, the use of a drop ball and crane to prepare pieces for the crushing mill, and the use of trucks and belt conveyors to take the stone to stockpiles for delivery to customers were part of an integrated process within the sales and use tax exemption provided by subsection 6 (s); however, other trucks used primarily for loading the customers' trucks, but in part for mixing the stockpiles, were not within the exemption. [163-165]

APPEALS from a decision of the Appellate Tax Board.

*James R. Hopkins* for the taxpayer.

*Daniel J. Johnedis,* Assistant Attorney General, for the State Tax Commission.

CUTTER, J.   The commission and the taxpayer each appeal from the decision of the Appellate Tax Board (the board) granting a partial abatement of sales and use taxes assessed under St. 1966, c. 14.[1]   The taxpayer contends that, under c. 14, § 1, subsecs. 6 (r) and 6 (s), and § 2, subsec. (5), machinery parts and supplies purchased for use in its crushed stone business were exempt from the excise imposed by c. 14.   The commission claims that the excise was applicable to the purchase or use of the items.   Certain facts were agreed.   The board made a preliminary order containing certain findings, and also findings and a report in accordance with G. L. c. 58A, § 13, as amended through St. 1969, c. 692.   The facts are primarily stated on the basis of the board's preliminary order and later report.[2]   The question for decision is the extent to which the statute (c. 14) exempts from excise the acquisition or use of machinery, machinery parts, and supplies used or consumed in the taxpayer's stone crushing operations.

The taxpayer is engaged primarily in producing for sale crushed stone, manufactured gravel, and treated stone.   It owns a quarry of about 100 acres.   The process may be described roughly in the following manner.   The "overburden" of soil covering the rock formation is removed and piled for sale.   Automatic drills, with compressors, are used to drill holes in the rock formation.   These holes are loaded with explosives.   A blast takes place.   Some larger fragments of the blasted rock are sold for use in shore protection.   Some pieces, too large for use in the crushing mill, require further demolition by a drop ball attached to a power crane.   A power shovel loads the rock pieces on Euclid trucks, used only on the

---

[1] The excises claimed to be applicable in 1966 were imposed by St. 1966, c. 14, which was to expire on December 31, 1967.  As the result of a vote of the people at the election in November, 1966, the tax was continued in G. L. c. 64H and 64I.  See St. 1967, c. 757, §§ 1, 2.

[2] The case is before us on a consolidated record, jointly designated, consisting of the pleadings, the statement of agreed facts, the board's preliminary order, its decision and findings, a transcript of the evidence, and the exhibits.

quarry premises, to take the rock to the first stage in the crushing plant, "a large building containing machinery that operates crushing mills, conveyor belts, vibrating and sorting equipment, bins, and hoppers."

There the rock is further crushed into rocks or stone fragments of varying sizes. Some is sold as crushed stone. Other rock, when crushed and sized, is used either (a) to make and place in stockpiles manufactured gravel by mixing it with sand, purchased by the taxpayer, or (b) to produce treated stone by coating small stones with oil and allowing the mixture to settle for twenty-four hours.

In addition to the machinery and Euclid trucks mentioned above, the taxpayer has used front-end loaders about ten per cent of the time for turning over the stockpiles of treated stone and manufactured gravel, and about ninety per cent of the time in placing products on customers' trucks. Other trucks transport overburden soil or crushed stone to their respective stockpiles.

The board, by its preliminary order, held (a) that the production of manufactured gravel and of treated stone constitutes manufacture as used in St. 1966, c. 14, § 1, subsecs. 6 (r) and 6 (s); (b) that preparation before mixing, and stockpiling of such gravel and treated stone, do not constitute manufacturing; (c) that the taxpayer's activities, beginning with the actual crushing of large stones and ending with small stones of merchantable size, constitute "conversion or processing of tangible personal property," as do the reduction and demolition of oversized rock by use of a crane and drop ball; and (d) that transportation of large stones to the crusher plant and the subsequent removal of smaller sifted stones to the stockpiles "are not . . . processing and conversion of the stone." It concluded that materials, tools, and fuel used directly in the work classified as manufacture are exempt under subsec. 6 (r) and that machinery or replacement parts used directly in conversion and processing are exempt under subsec. 6 (s).

In its opinion, the board expanded its rulings slightly.

(1) It ruled that "the machinery, materials, and Euclid trucks used to separate the rock from the real estate and to transport it to the crushing mill are not used . . . *directly* in a manufacturing or conversion process of tangible personal property" because, prior to blasting, the rock is real estate. (2) The vehicles used to transport products to a stockpile, it ruled also, were not used directly in manufacturing or processing. (3) The first massive sections of rock obtained by blasting, it ruled "are not the product of a manufacturing or conversion process as no change in the rock has been made since rendering it personalty." (4) The board correctly ruled that it was not confined under this excise to considering whether machinery or parts were used directly in manufacturing, see subsec. 6 (s),[3] because in any event sales of machinery or replacement parts used (emphasis supplied) "in an industrial plant in the manufacture, *conversion or processing* of tangible personal property to be sold" were exempt under subsec. 6 (s).[4]

1. The board correctly regarded the legislative use in subsec. 6 (s) of the words "conversion or processing" as intended to include preparation of crushed stone "by converting it into a marketable form." In effect, the board found it unnecessary for the purposes of subsec. 6 (s) to consider whether stone crushing would now be regarded as constituting manufacture. Cf. *Wellington* v. *Belmont*, 164 Mass. 142, 143 (quarrying stone and breaking it up not manufacturing within Pub. Sts. c. 11, § 20, cl. 2); *Iowa Limestone Co.* v. *Cook*, 211 Iowa, 534, 537–541;

---

[3] The controlling provisions of St. 1966, c. 14, § 1 (see also § 2, subsec. 5 [b]), are the exemptions found in subsecs. 6(r) and 6(s). These read (emphasis supplied) in part, "(r) Sales of materials, tools and fuel . . . which become an ingredient or component part of tangible personal property to be sold or which are consumed and used directly . . . in an industrial plant *in the process of the manufacture* of tangible personal property to be sold . . . . (s) Sales of machinery, or replacement parts thereof, used directly . . . in an industrial plant *in the manufacture, conversion or processing* of tangible personal property to be sold . . . ."

[4] The taxpayer's requests for rulings of law adequately raised for the board's determination whether the taxpayer's various items of supplies, fuel, machinery, parts, and vehicles were subject to the excise.

*People ex rel. Tomkins Cove Stone Co.* v. *State Tax Commn.* 176 App. Div. (N. Y.) 1, 3–6; *Commonwealth* v. *John T. Dyer Quarry Co.* 250 Pa. 589, 591–595. Cf. also *Commissioner of Corps. & Taxn.* v. *Assessors of Boston,* 321 Mass. 90, 93–95. The board's general conclusion, as far as it went, on the meaning of "conversion or processing" is supported by cases elsewhere. These cases also tend to give a substantially broader meaning to "manufacture" than did the *Welling* case, 164 Mass. 142. See e.g. *State* v. *Four States Drilling Co. Inc.* 278 Ala. 273, 277–278; *France Co.* v. *Evatt,* 143 Ohio St. 455, 456–457; *National Tube Co.* v. *Glander,* 157 Ohio St. 407, 410. See also *Commonwealth* v. *W. J. Sparks Co.* 222 Ky. 606, 608; *Michigan Allied Dairy Assn.* v. *State Bd. of Tax. Admn.* 302 Mich. 643, 646–651; *West Lake Quarry & Material Co. Inc.* v. *Schaffner,* 451 S. W. 2d 140, 143 (Mo.); *Tulsa Mach. Co.* v. *Oklahoma Tax Commn.* 208 Okla. 138, 139–140.

It, of course, will be noted that the language (fn. 3) of subsec. 6 (r), "in the process of the manufacture," varies from that used in subsec. 6 (s), viz., "in the manufacture, conversion or processing." Our earlier cases (see *Wakefield Ready-Mixed Concrete Co. Inc.* v. *State Tax Commn.* 356 Mass. 8, 9, fn. 3, and *Courier Citizen Co.* v. *Commissioner of Corps. & Taxn.* 358 Mass. 563, 566, fn. 6) presented no question requiring the making of any distinction between these two provisions. We are of opinion that, in the context of the 1966 statute (despite the holding in the *Wellington* case, 164 Mass. 142), the terms are essentially interchangeable and that it would result in meaningless refinement and a great deal of administrative complication to attempt to distinguish between them in the absence of a very clear statutory mandate to do so. The issue under subsec. 6 (r) and subsec. 6 (s) we treat as being the same in this respect.

2. It must be determined when, in the usual course of the work, the taxpayer's "processing" activities begin. The initial blasting serves not only to separate the rock from the real estate but also the blasts are so arranged

as to produce the maximum breaking up of the separated
rock.  Prior to the blast, a piece of rock cliff undoubtedly
constitutes real estate.  Nevertheless, the steps prepara-
tory to and bringing about its severance from the cliff
involve processing in the sense that they result in partial
fragmentation of the separated rock.  We must decide
whether the statutory exemption contemplates that action
with respect to rock while it remains real estate be treated
as processing.

The commission refers us to decisions which indicate
that somewhat similar exemptions of machinery used in
manufacture and processing do not extend to machinery
and parts used in separating from the land items which
are real estate until severed.  See *State* v. *Joe H. Brady
& Associates*, 264 Ala. 397, 400–401 (power saws used to
cut down trees), but compare *State* v. *Four States Drill-
ing Co. Inc.* 278 Ala. 273, 275–279 (casing and other
materials used to separate oil) ; *Linwood Stone Prods.
Co.* v. *State Dept. of Rev.* 175 N. W. 2d 393, 394–395
(Iowa) (exemption not applicable on machinery used on
rock until it reaches crusher) ; *Tulsa Mach. Co.* v. *Okla-
homa Tax Commn.* 208 Akla. 138, 140.  The taxpayer, on
the other hand, argues that c. 14, § 1, subsec. 6 (s),
refers to "processing of tangible personal property *to be
sold*" (emphasis supplied) and thus lays stress on the
crushed end product, which is personalty, rather than
dealing with the unsevered rock.  It contends that subsec.
6 (s) should be applicable if the end product of the
processing is tangible personal property, since sales at
retail or use of only such property are subject to the
excise.  It purports to find authority for this view in the
*Courier Citizen Co. case*, 358 Mass. 563, 567–569.  See
Barrett and Bailey, Taxation (2d ed.) §§ 1317, 1341.

We have recognized (see the *Courier Citizen Co.* case,
at p. 566, fn. 7) that the exemption is ambiguous. . It
remains so, in the respects now discussed, despite efforts
at clarification.  See St. 1971, c. 555, § 45.

We accept the logic of the taxpayer's position that, at
least in this quarry, processing begins with the fragmen-

tation of the rock by the initial blast, even though the decided cases, cited above, in general reach a different conclusion. The quarry operation appears to be reasonably integrated, starting with severance of the rock and continuing until the product is stockpiled for delivery to customers. To fail to recognize the process as a continuous whole would run counter to the *Courier Citizen* case, at pp. 571–573, where (citing *Niagara Mohawk Power Corp.* v. *Wanamaker*, 286 App. Div. (N. Y.) 446, affd. 2 N. Y. 2d 764), we declined to split somewhat artificially into "theoretically distinct" segments a program that was essentially "continuous and indivisible."

3. If processing starts with the initial blast, we think that the subsequent steps of collecting the rock broken by the initial blast and transporting it to the crushing plant are part of the integrated process carried on within the quarry. Further breaking up of the large pieces in the quarry by use of the drop ball and power crane seems to us clearly to be processing.

The quarry is essentially an industrial plant in which the production line for that rock, which is to be processed further than by the initial blast, begins at least with picking up the broken rock and taking it to the crushing mill.[5] If, instead of using Euclid trucks, the rocks had been placed on a conveyor belt or system, the conveyor system would have been regarded as an integral part of the crushing plant. We think (1) that the Euclid trucks are used directly in the processing operation where that use follows the processing implicit in the initial blast, and (2) that this operation continues until the crushed and screened materials have been stockpiled.[6] See *Schenley*

[5] We need not consider what the situation would be if the rock had been brought to the plant from outside the quarry.

[6] The authorities in this area are not uniform. For decisions holding that processing (and whatever production line exists) does not begin until the rocks reach the crusher, see *France Co.* v. *Evatt*, 143 Ohio St. 455, 458; *Tri-State Asphalt Corp.* v. *Glander*, 152 Ohio St. 497, 501–505; *Tulsa Mach. Co.* v. *Oklahoma Tax Commn.* 208 Okla. 138, 140. See also *Linwood Stone Prods. Co.* v. *State Dept. of Rev.* 175 N. W. 2d 393, 395 (Iowa). Compare *Alabama Power Co.* v. *State*, 267 Ala. 617, 619–620; *General Motors Corp.* v. *Bowers*, 164 Ohio St. 574, 576–577.

*Distillers, Inc.* v. *Commonwealth,* 467 S. W. 2d 598, 599–600 (Ky.). The stockpile trucks and belt conveyors which "take the stone . . . from underneath the bins and transport them to a given stockpile" constitute essential parts of an integrated program of manufacture and processing which is not completed until the materials are stored for sale. The stockpile trucks and conveyor belts are within the exemption given by subsec. 6 (s).

4. The front-end loaders used primarily for loading customers' trucks, but in part for mixing the stockpiles, we think are not used directly in manufacture or processing. They are not within the exemption. See *West Lake Quarry & Material Co. Inc.* v. *Schaffner,* 451 S. W. 2d 140, 143 (Mo.).

5. The decision of the board is to be modified to conform with the principles stated in this opinion, and the case is remanded to the board for further proceedings consistent with this opinion. The abatement owing to the taxpayer is to be computed and allowed with interest.

*So ordered.*