Sharp v. Tyler Pipe Indus. 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN








NO. 03-95-00212-CV








John Sharp, Comptroller of Public Accounts, and Dan Morales,


Attorney General of Texas, Appellants




v.




Tyler Pipe Industries, Inc., Successor-in-Interest to


 Tyler Pipe Industries of Texas, Inc., Appellee








FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT


NO. 93-07993, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING








 Tyler Pipe Industries, Inc., successor-in-interest to Tyler Pipe Industries of Texas,
Inc. ("Tyler Pipe"), sued State Comptroller John Sharp and State Attorney General Dan Morales
(collectively the "Comptroller") seeking a refund of sales taxes paid in the purchase of certain
equipment. See Tex. Tax Code Ann. § 112.151 (West 1992). The trial court granted summary
judgment for Tyler Pipe, ordering the Comptroller to refund approximately $35,000. On appeal,
the Comptroller asserts that the trial court misconstrued a statutory exemption for the purchase
of property used in manufacturing. See Tax Code § 151.318(g). We will affirm.



FACTUAL AND PROCEDURAL BACKGROUND


 There are no disputed facts in this case. Tyler Pipe manufactures and sells cast-iron pipe and pipe fittings, using molds made of specially treated sand to produce the desired size
and shape of both the interior and exterior surfaces of its products. There are five basic stages,
followed by all manufacturers, in manufacturing cast-iron pipe and fittings: (1) melting scrap iron
and steel; (2) forming a mold to the exact size and shape of the product being manufactured; (3)
pouring the molten iron into the mold; (4) letting the molten iron cool and harden; and (5)
removing the pipe casting from the mold and knocking off any rough edges.

 Metal molds are used by some manufacturers in lieu of sand molds. Metal molds,
which are permanent and can be used repeatedly, are used to make thin-walled, low-pressure pipe
and fittings. Sand molds, on the other hand, are needed to make thick-walled, high-pressure pipe. 
Unlike metal molds, sand molds can be used only once, after which they are destroyed. It is
through the use of one of these two types of molds that manufacturers of cast-iron pipe and fittings
control the size and shape of the products they produce.

 In 1990, Tyler Pipe bought certain equipment used for making sand molds to be
employed in its manufacture of cast-iron pipe and fittings, paying sales taxes on the purchase. 
Tyler Pipe subsequently filed an administrative claim for a refund of $35,478.46, twenty-five
percent of the total amount of tax paid, in accordance with the phase-in schedule for the
"manufacturers' exemption." See Tax Code § 151.318(h). The tax division of the Comptroller's
office denied the refund. The Comptroller subsequently affirmed the denial, concluding that
although the molds themselves were used in the "actual manufacturing" of pipe and fittings, the
mold-making equipment was not. Tyler Pipe appealed to the district court. After cross-motions
for summary judgment were filed, the trial court granted summary judgment in favor of Tyler
Pipe. It is from this judgment that the Comptroller appeals to this Court.



DISCUSSION


 In a single point of error, the Comptroller contends that Tyler Pipe's purchase of
equipment for use in making sand molds does not qualify for the manufacturers' exemption from
sales taxes found in section 151.318(g) of the Tax Code:



Each person engaged in manufacturing, processing, fabricating, or repairing
tangible personal property for ultimate sale is entitled to a refund or a reduction in
the amount of tax imposed by this chapter as provided by Subsection (h) for the
purchase of machinery, equipment, and replacement parts or accessories with a
useful life in excess of six months if the equipment is used or consumed in or
during the actual manufacturing, processing, fabrication, or repair of tangible
personal property for ultimate sale, and the use or consumption of the property is
necessary or essential to the manufacturing, processing, fabrication, or repair
operation, or to a pollution control process.



Tax Code § 151.318(g) (emphasis added).

 Of the statutory prerequisites for the manufacturers' exemption, there is no dispute
that the mold-making equipment in question has a useful life in excess of six months. Nor is there
any dispute that the mold-making equipment is necessary and essential to the production of cast-iron pipe and fittings. The sole issue here is whether such mold-making equipment is "used . .
. in or during the actual manufacturing" of Tyler Pipe's products. Because the mold-making
equipment in question is used to form sand molds, which are not themselves for sale, but rather
are used in turn to produce the desired size pipe and fittings, the Comptroller contends that the
mold-making equipment is not used in the "actual manufacturing . . . of tangible personal property
for ultimate sale." In other words, the Comptroller argues that even when equipment is part of
the fabrication process, it is not tax exempt unless it is used directly on the raw materials to
produce the finished product.



A.  "Manufacturing" vs. "Actual Manufacturing"

 The Comptroller argues first that by adopting Tyler Pipe's construction of section
151.318(g), the trial court gave no effect to the term "actual," thereby rendering it mere
surplusage. The term "manufacturing" is defined in the Tax Code as "includ[ing] each operation
beginning with the first stage in the production of tangible personal property and ending with the
completion of tangible personal property having the physical properties . . . that it has when
transferred by the manufacturer to another." Tax Code § 151.318(d). The Comptroller argues,
however, that the language of subsection (g) mandates a direct contact with the finished product
in order to qualify for the exemption. "Actual manufacturing," he contends, differs from
"manufacturing," and the process of making a sand mold is distinct from that of making pipe and
fittings. We conclude, however, that even assuming the legislature intended the term "actual" to
limit the scope of "manufacturing," Tyler Pipe's mold-making equipment falls within any
reasonable construction of "actual manufacturing."

 "Actual" is defined simply as "existing in fact or reality: really acted . . . or carried
out . . . [as] distinguished from apparent and nominal. . . . Something that . . . exists in fact:
reality." Webster's Third New International Dictionary 22 (Philip B. Gove ed., 1986). The
summary-judgment evidence shows that the formation of a sand mold for the making of a pipe or
fitting is not part of the mere preparation for the casting process, as the Comptroller contends. 
Rather, it is an indispensable operation in the actual production of cast-iron pipe and fittings. The
summary-judgment evidence reflects that in this industry, because each mold is specialized for
each pipe, and because sand molds can only be used once, manufacturers find it more efficient
to produce their own sand molds than to purchase them from outside suppliers. As a result, the
mold-making equipment and each mold it produces effectively act as a unit. The mold-making
equipment is needed every time a mold is made; thus, because the mold can only be used once,
the mold-making equipment is needed every time a pipe or fitting is made. Because each mold
can be used to make only one product, the mold-making equipment has a direct relationship to the
production process.

 The way Tyler Pipe uses its mold-making equipment is analogous to the way a
camera produces a photograph and the way a printing press produces a written publication. In
photography, a camera is needed to produce a negative imagethe intermediate productwhich
is then used to produce the positive print for sale. Similarly, printers need equipment to make
printing plates, which are then used to transfer images to paper, making the final printed product. 
Because Tyler Pipe's mold-making equipment creates a unique mold that transfers specific
measurements to molten iron to produce a pipe or fitting, we see no practical distinction between
such equipment and a camera or plate-making equipment.

 The Comptroller has admittedly allowed the sales tax exemption for both cameras
and plate-making equipment. Moreover, other jurisdictions have also held such equipment to be
exempt under similar statutes. For example, in allowing the tax exemption for a printer's plate-making equipment, the Massachusetts Supreme Judicial Court rejected the idea that printing plates
were produced for the manufacturer's own use. Courier Citizen Co. v. Commissioner of Corps.
& Taxation, 266 N.E.2d 284, 286 (Mass. 1971). The printing plates in Courier, like the sand
molds in the present case, were not reusable because they were discarded after the pressrun;
therefore, their purpose was connected to a particular printing job, just as molds here are used in
the fabrication of a particular pipe or fitting. Id. The court found that the production of printing
plates was the first stage in the process culminating in the final printed product for sale. Id. 
Likewise, the production of sand molds via the mold-making equipment is simply an early stage
in the productionthe "actual manufacturing"of cast-iron pipe and fittings.



B.  Presumption of Use in "Actual Manufacturing"?

 The Comptroller next argues that because the mold-making equipment was
admittedly essential to Tyler Pipe's overall manufacturing operation (the third requirement of
section 151.318(g)), the trial court erroneously presumed that the equipment must have been used
in the "actual manufacturing" of products for ultimate sale (the second statutory requirement). 
We find no indication in the record, however, that the trial court employed any such presumption
or otherwise disregarded the requirement that the equipment in question be used in the actual
manufacturing of property for ultimate sale. This second argument by the Comptroller seems to
be simply a variation of his first argument.



C.  Split Among Jurisdictions

 Finally, the Comptroller argues that the trial court refused to follow well-established Texas law requiring strict construction of tax exemptions. See, e.g., North Alamo
Water Supply Corp. v. Willacy County Appraisal Dist., 804 S.W.2d 894, 899 (Tex. 1991). In
support of this argument, the Comptroller asserts that decisions from other jurisdictions have split
into two groups: (1) those adopting the so-called "integrated plant theory," which gives similar
exemptions a broader construction; and (2) those following the so-called "Ohio rule" or "physical
change rule," which gives such exemptions a narrower reading. The Comptroller contends that
by granting summary judgment for Tyler Pipe, the trial court committed error by failing to strictly
construe section 151.318(g) of the Tax Code. We disagree.

 The Comptroller is correct that a split exists among jurisdictions construing similar
statutes. See John S. Herbrand, Annotation, What Constitutes Direct Use Within Meaning of
Statute Exempting from Sales and Use Taxes Equipment Directly Used in Production of Tangible
Personal Property, 3 A.L.R.4th 1129 (1981); W. E. Shipley, Annotation, Items or Materials
Exempt from Use Tax as Used in Manufacturing, Processing, or the Like, 30 A.L.R.2d 1439
(1953). The Comptroller attempts to cast this division of authorities in terms of "liberal" and
"strict," using these labels to argue that Texas law requires adoption of the construction embraced
by the "strict" jurisdictions. But the labels are misleading. Courts of virtually all jurisdictions
are required to construe tax exemptions strictly. See 3A Norman J. Singer, Sutherland Statutory
Construction § 66.09 (5th ed. 1992) Thus, the split among the courts that have addressed this
issue is not based on "strict versus liberal" construction.

 Rather, at least two other principles are at work. First, the rule of strict
construction cannot be used as an excuse to stray from reasonableness. "It is generally held that
the statutes exempting property from taxation should be strictly construed in favor of taxation, but
should not be interpreted unreasonably." 3A Singer, supra § 66.09, at 43 (emphasis added). 
This principle comports with Texas law, where courts are obliged to presume that the legislature
intended a "just and reasonable result." Tex. Gov't Code Ann. § 311.021(3) (West 1988).

 Second, the cardinal rule of statutory construction is always to determine and give
effect to the intention of the legislature. Union Bankers Ins. Co. v. Shelton, 889 S.W.2d 278, 280
(Tex. 1994). Again, Texas courts are admonished to consider "the language of the statute,
legislative history, the nature and object to be obtained, and the consequences that would follow
from alternative constructions." Id.

 The Texas manufacturers' exemption statute was originally enacted by the
legislature in 1961 and has been amended several times over the years. (1) Although the legislative
history of these enactments is unenlightening, there can be little doubt of the legislature's general
purposes: (1) to encourage economic development in this state; (2) to avoid pyramiding the sales
tax on successive buyers and sellers, which would result in the ultimate consumer paying sales
tax on sales tax; and (3) to strike a balance between the policy of avoiding multiple taxation and
the need to raise revenue for the state. See, e.g., Niagara Mohawk Power Corp. v. Wanamaker,
144 N.Y.S.2d 458, 461-62 (App. Div. 1955), aff'd mem., 139 N.E.2d 150 (N.Y. 1956). Given
such purposes, courts of other jurisdictions have recognized that construing tax-exemption statutes
too narrowly could defeat the legislative purpose of such statutes:



[T]he production exemption must be viewed in light of the legislative intent to tax
the ultimate retail consumer, thus avoiding multiple taxation. The production
exemption is designed to exempt those items and costs of producing the final
product for resale to the consumer. Although construction of exemption statutes
is generally to be construed against the taxpayer, the overall scheme and intent of
the legislation must not be overlooked.



Idaho State Tax Comm'n v. Haener Bros., 828 P.2d 304, 307 (Idaho 1992). Likewise, in
construing a similar statute, the Supreme Court of Georgia stated that the rule of strict
construction "should not impinge on the other rule that a statute is to be construed in accordance
with its real intent and meaning and not so strictly as to defeat the legislative purpose." Amoena
Corp. v. Strickland, 283 S.E.2d 894, 897 (Ga. 1981). We believe the construction urged by the
Comptroller is unreasonably restrictive and would tend to thwart, not further, the legislature's
intent.

 In support of his argument that the exemption requires direct involvement or
contact with the product being manufactured for ultimate sale, the Comptroller relies on three
Ohio Supreme Court cases: Canton Malleable Iron Co. v. Porterfield, 283 N.E.2d 434 (Ohio
1972); Ohio Stove Co. v. Bowers, 172 N.E.2d 295 (Ohio 1961); General Motors Corp. v.
Bowers, 159 N.E.2d 739 (Ohio 1959). While these cases arguably support the Comptroller's
position, we decline to adopt the Ohio rule, for the following reasons.

 First, the Comptroller fails to note the differences in statutory language. The Ohio
statute requires machinery to be used "directly" in manufacturing. See, e.g., General Motors
Corp. v. Limbach, 547 N.E.2d 1167, 1168 (Ohio 1989). Indeed, the Ohio cases have consistently
stressed the importance of the term "directly." For example, when refusing to allow the
exemption for tools purchased to manufacture other tools that were then used to produce the
property for ultimate sale, the Ohio court said that to allow the exemption "would constitute a
disregard of the plain meaning of the word `directly' which the dictionaries define as `without
the intervention of a medium or agent.' It would seem beyond cavil that the manufactured tools
are an intervention between the purchased tools and the final body panels." General Motors
Corp., 159 N.E.2d at 741.

 The Ohio Supreme Court recently confirmed its total reliance on the term "directly"
for its continued loyalty to the "physical change rule." In Stoneco, Inc. v. Limbach, 560 N.E.2d
578 (Ohio 1990), the court construed a personal-property-tax statute allowing an investment credit
based on ownership of "machinery . . . used or designed to be used in refining or manufacturing." 
Id. at 579. Unlike the sales-tax-exemption statute, this provision did not contain the term
"directly." In holding the property to be exempt, the court stated:



The statutes under review do not contain the term "directly," as does the sales tax. 
This term has prevented us from applying the integrated plant test to the sales tax,
to which we have instead applied the physical change test. However, we see no
corresponding statutory constraint against applying an integrated plant test to
personal property tax cases and to the disputed investment credit.



Id. at 581 (emphasis added) (citations omitted).

 The Texas statute contains no restriction such as that determined by the Ohio court
to be imposed by the term "directly." We do not construe the term "actual" to prohibit the
existence of any intervening medium or agent in the manufacturing process. Moreover, as
discussed above, Tyler Pipe's use of its mold-making equipment is in fact part of the
manufacturing process; it does not play a nominal, incidental, or attenuated role in the production
of pipe. The equipment's connection to the manufacturing process is not potential, speculative,
or constructive; it is an integral part of the production of cast-iron pipe and fittings.

 In addition, the overwhelming majority of jurisdictions that have addressed similar
tax-exemption statutes, even those containing the term "directly," have rejected Ohio's physical-change theory in favor of a broader reading. (2) As one frustrated Ohio Supreme Court justice stated
in a plea for the court to abandon the physical-change rule, "The great weight of authority
throughout the country supports adoption of the `integrated plant' theory." Oamco v. Lindley,
493 N.E.2d 1345, 1349 n.1 (Ohio 1986) (Wright, J., concurring).

 Thus, most state courts have allowed an exemption in circumstances similar to
those in the present case even though the statutes of those jurisdictions generally require that the
property's use in manufacturing be "direct," a more specific and demanding requirement than
"actual." For example, the Idaho Supreme Court, construing a statute exempting property that
was "primarily and directly used" in manufacturing operations, expressly held that machinery and
tools used to construct and make other manufacturing machinery, tools, and materials are exempt. 
Haener Bros., 828 P.2d at 310. The Idaho court concluded that the "primarily and directly"
requirement



does not require that the materials, equipment and property used in the production
process must directly touch or be actually contained in the final product. The
language "primarily and directly" only means that the materials and personal
property must play a primary and direct role in making the final product
marketable. . . . Machinery . . . used to fabricate . . . other equipment . . . for
manufacturing and processing is only one vital segment of the complete integrated
plant system and operation.



Id. at 315.

 For purposes of this appeal, it seems to us unnecessary that we formally adopt or
approve the so-called integrated-plant theory, which, according to Tyler Pipe, "embraces all of
the operations in a manufacturing plant that are causally connected to the production of the final
product." Accordingly, we simply conclude that the equipment Tyler Pipe uses in making sand
molds is, in these circumstances, "used . . . in the actual manufacturing" of its cast-iron pipe and
fittings. We overrule the Comptroller's point of error.


CONCLUSION


 Because Tyler Pipe conclusively demonstrated that its mold-making equipment is
used in the "actual manufacturing" of cast-iron pipe and fittings, we conclude that it is entitled to
a sales tax exemption in the purchase of that equipment. We affirm the judgment of the trial
court.



 J. Woodfin Jones, Justice

Before Chief Justice Carroll, Justices Jones and B. A. Smith

Affirmed

Filed: March 13, 1996 

Publish

1.   See Limited Sales, Excise and Use Tax Act, 57th Leg., 1st C.S., ch. 24, art. I, § 1,
1961 Tex. Gen. Laws 71, 76, 82; Act of May 2, 1963, 58th Leg., R.S., ch. 138, § 1, 1963
Tex. Gen. Laws 371, 376, 382; Tax CodeTitle 2, 67th Leg., R.S., ch. 389, § 1, 1981 Tex.
Gen. Laws 1490, 1564; Act of July 21, 1987, 70th Leg., 2nd C.S., ch. 5, art.1, pt. 4, § 26,
1987 Tex. Gen. Laws 9, 19; Act of May 8, 1989, 71st Leg., R.S., ch. 154, § 1, 1989 Tex.
Gen. Laws 532, 533.
2.   See generally Duval Sierrita Corp. v. Arizona Dep't of Revenue, 568 P.2d 1098, 1104
(Ariz. Ct. App. 1977) ("used directly") (stating that "we believe the corollary to the `Ohio
rule' and its interpretation by that state is too narrow"); Pledger v. Easco Hand Tools, Inc.,
800 S.W.2d 690 (Ark. 1990) ("used directly"); Arkansas Ry. Equip. Co. v. Heath, 519
S.W.2d 45 (Ark. 1975); Idaho State Tax Comm'n v. Haener Bros., 828 P.2d 304, 310 (Idaho
1992) ("primarily and directly used") (criticizing as "twisted [and] unreasonable" an
interpretation that only equipment that touches final product is entitled to exemption); Indiana
Dep't of State Revenue v. Cave Stone, Inc., 457 N.E.2d 520 (Ind. 1983) ("directly used . . . in
the direct production"); General Motors Corp. v. Indiana Dep't of State Revenue, 578 N.E.2d
399 (Ind. Tax Ct. 1991); City of Ames v. State Tax Comm'n, 71 N.W.2d 15 (Iowa 1955)
("directly used"); Ross v. Greene & Webb Lumber Co., 567 S.W.2d 302 (Ky. 1978) ("used
directly"); Schenley Distillers, Inc. v. Commonwealth ex rel. Luckett, 467 S.W.2d 598 (Ky.
Ct. App. 1971); Courier Citizen Co. v. Commissioner of Corps. & Taxation, 266 N.E.2d 284,
290 (Mass. 1971) ("used directly") (stating that "[w]e think the Ohio cases are too
restrictive"); Floyd Charcoal Co. v. Director of Revenue, 599 S.W.2d 173, 177 (Mo. 1980)
("used directly") (stating that "[t]he Ohio rule has been considered too restrictive by other
courts which have been presented with a similar problem"); Niagara Mohawk Power Corp. v.
Wanamaker, 144 N.Y.S.2d 458, 461-62 (App. Div. 1955) ("use[d] . . . directly and
exclusively") (stating that "`directly and exclusively' should not be construed to require the
division into theoretically distinct stages of what is in fact continuous and indivisible"), aff'd
mem., 139 N.E.2d 150 (N.Y. 1956); Manitowoc Co. v. City of Sturgeon Bay, 362 N.W.2d
432 (Wis. Ct. App. 1984) ("used directly"); State Bd. of Equalization v. Cheyenne
Newspapers, Inc., 611 P.2d 805 (Wyo. 1980) ("directly enters into"). But see Hawes v.
Custom Canners, Inc., 173 S.E.2d 400 (Ga. Ct. App. 1970); Webster Brick Co. v. Department
of Taxation, 245 S.E.2d 252 (Va. 1978).


l product
marketable. . . . Machinery . . . used to fabricate . . . other equipment . . . for
manufacturing and processing is only one vital segment of the complete integrated
plant system and operation.



Id. at 315.

 For purposes of this appeal, it seems to us unnecessary that we formally adopt or
approve the so-called integra