LOWELL SUN PUBLISHING COMPANY & others[1] *vs.*
COMMISSIONER OF REVENUE.

Suffolk. March 6, 1986. — May 27, 1986.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Taxation,* Sales and use tax, Exemption, Newspaper. *Administrative Law,*
Agency's interpretation of statute, Regulations.

Regulations issued by the Commissioner of Revenue imposing sales and
use taxes on materials and machinery used in early stages of newspaper
production, such as typing and editing a story and preparing classified
and display advertising, were invalid in imposing sales and use taxes
inconsistent with the exemptions provided by G. L. c. 64H, § 6 (*r*) and
(*s*), insofar as the regulations applied to materials and machinery used
directly and exclusively in the publishing of a newspaper during processes
occurring in an industrial plant. [652-656]

CIVIL ACTION commenced in the Superior Court Department
on November 19, 1982.

The case was reported to the Appeals Court by *Francis J.
Quirico,* J. The Supreme Judicial Court granted a request for
direct review.

*James C. Heigham* (*Harry S. Dannenberg* with him) for the
plaintiffs.

*Joan C. Stoddard,* Assistant Attorney General, for the Com-
missioner of Revenue.

*John S. Brown, George P. Mair, Wilmot R. Hastings &
David L. Engel,* for Globe Newspaper Company, amicus
curiae, submitted a brief.

---

[1] The Massachusetts Newspaper Publishers Association, an association
of daily and weekly newspapers published in the Commonwealth; its past
president, James I. O'Hearn; and its current president, William F. Lucey,
Jr. For convenience we shall refer to the plaintiffs collectively as the news-
papers.

WILKINS, J. A judge of the Superior Court has reported questions in this action, brought under G. L. c. 30A, § 7 (1984 ed.), and G. L. c. 231A (1984 ed.), challenging the validity of the Commissioner of Revenue's (commissioner's) sales and use tax regulations. 830 Code Mass. Regs. § 64H.07 (1982). The newspapers contend that the regulations concerning the taxability for sales and use tax purposes of certain materials and machinery used in the publishing of newspapers do not properly reflect the scope of the exemptions from sales and use taxes set forth in G. L. c. 64H, § 6 (*r*) (1984 ed.),[2] and G. L. c. 64H, § 6 (*s*) (1984 ed.).[3] See G. L. c. 64I, § 7 (*b*)

---

[2] Subsection (*r*), as pertinent here, provides an exemption for:

"Sales of materials, tools and fuel, or any substitute therefor, which become an ingredient or component part of tangible personal property to be sold or which are consumed and used directly and exclusively . . . in an industrial plant in the actual manufacture of tangible personal property to be sold, including the publishing of a newspaper . . . . For the purpose of this paragraph, . . . any material, tool or fuel shall be construed to be consumed and used only if its normal useful life is less than one year or if its cost is allowable as an ordinary and necessary business expense for federal income tax purposes . . . ; and the term 'industrial plant' shall mean a factory at a fixed location primarily engaged in the manufacture, conversion or processing of tangible personal property to be sold in the regular course of business."

[3] Subsection (*s*), as most pertinent here, provides an exemption for:

"Sales of machinery, or replacement parts thereof, used directly and exclusively . . . in an industrial plant in the actual manufacture, conversion or processing of tangible personal property to be sold, including the publishing of a newspaper . . . . For the purpose of this paragraph, . . . the term 'industrial plant' shall mean a factory at a fixed location primarily engaged in the manufacture, conversion or processing of tangible personal property to be sold in the regular course of business; and machinery shall be deemed to be used directly and exclusively in the actual manufacture, conversion or processing of tangible personal property to be sold only where such machinery is used solely during a manufacturing, conversion or processing operation to effect a direct and immediate physical change upon the tangible personal property to be sold; to guide or measure a direct and immediate physical change upon such property where such function is an integral and essential part of tuning, verifying or aligning the component parts of such property; or to test or measure such property where such function is an integral part of the production flow or function; used solely to store, transport, convey or handle such property during the manufacturing, converting, or processing operations heretofore specified; or used solely to place such property in the container, package or wrapping in which such property is normally sold to the ultimate consumer thereof."

(1984 ed.), incorporating exemptions from G. L. c. 64H for similar transactions that would otherwise be subject to the use tax.

The newspapers read the exemptions for sales of materials (§ 6 [r]) and machinery (§ 6 [s]) used in "the publishing of a newspaper" more broadly than has the commissioner. If the newspapers are correct, and we think in large measure they are, the regulations are invalid in certain respects because they seek to impose sales and use taxes beyond the authorization of the statute.

The case is here on a report based on an agreement "on all material facts necessary to the adjudication of the legal questions presented by this case." Of the questions, which are set forth in the margin,[4] we need only answer the second, which focuses exclusively on the validity of the regulations as applied to steps in the newspaper production process that are the subject of this controversy.[5]

---

[4] "(1) Are the Newspaper Sales and Use Tax Regulations codified at 830 C.M.R. 64H.07 consistent with G. L. c. 64H, § 6(r) and § 6(s) which provide exemptions to the sales tax (G. L. c. 64H, § 2) and use tax (G. L. c. 64I, § 2) for '[s]ales of materials [and] tools . . . which . . . are consumed and used directly and exclusively . . . in the actual manufacture of tangible personal property to be sold, including the publishing of a newspaper . . .' (G. L. c. 64H, § 6[r]), and for '[s]ales of machinery, or replacement parts thereof, used directly and exclusively . . . in an industrial plant in the actual manufacture, conversion or processing of tangible personal property to be sold, including publishing of a newspaper . . .' (G. L. c. 64H, § 6[s])?

"(2) Are the Newspaper Sales and Use Tax Regulations codified at 830 C.M.R. 64H.07 consistent with G. L. c. 64H, § 6(r) and § 6(s) insofar as they impose sales and use taxes (G. L. c. 64H, § 2; 64I, § 2) on those steps of the newspaper production process set forth in paragraphs 7A-7J of the Statement of Agreed Facts filed herein?

"(3) Are the Newspaper Sales and Use Tax Regulations codified at 830 C.M.R. 64H.07 constitutional insofar as they impose sales and use taxes on those steps of the newspaper production process set forth in paragraphs 7A-7J of the Statement of Agreed Facts filed herein?"

[5] The first question raises generally the validity of the regulations and is not directed specifically to materials and machinery described in the statement of agreed facts. By answering the second and more specific question, we address the controversy between the newspapers and the commissioner. The third question inquires in general terms whether the regulations are constitutional as applied to the same production processes referred to in the second question. We need not address the constitutional issues.

The newspapers and the commissioner agree that sales of materials and machinery used in the printing of a newspaper are exempt from tax under § 6 (*r*) and (*s*). They disagree, however, over whether the exemption applies to materials and machinery used in earlier stages in the process of the production of a newspaper, such as in the typing and editing of a story and in the preparation of classified and display advertising. As the reported questions indicate, these preprinting processes are set forth in detail in paragraphs 7A to 7J of the statement of agreed facts.[6]

The challenged regulations, which became effective in October, 1982, represented a sharp change in the commissioner's treatment of the exemptions applicable to sales of materials and machinery used in the publishing of a newspaper. In *Courier Citizen Co. v. Commissioner of Corps. & Taxation,* 358 Mass. 563 (1971), we construed G. L. c. 64H, § 6 (*r*) and (*s*) inserted by St. 1967, c. 757, § 1, to provide exemptions for materials and machinery used in a fully integrated printing business. Shortly after that opinion was issued, the Legislature substantially amended § 6 (*r*) and (*s*) to read, in pertinent part, as they now do. St. 1971, c. 555, § 45. The State Tax Commission concluded subsequently that the 1971 amendments had overruled the expansive interpretation of § 6 (*r*) and (*s*) stated in the *Courier Citizen* opinion, and it sought to impose taxes on materials and machinery used in preprinting processes in the publication of a newspaper. The Appellate Tax Board disagreed with the commission, concluding that the 1971 amendments to § 6 (*r*) and (*s*) did not affect the continuing validity of the *Courier Citizen* opinion, at least as applied to newspapers. *Attleboro Sun Publishing Corp.* v. *State Tax Comm'n,* [1967-1984 Transfer Binder] Mass. Tax Rep. (CCH) ¶200-444

---

[6] Paragraphs 7A to 7J appear in an appendix to this opinion. The parties agree that sales of materials and machinery used in subsequent processes described in paragraphs 7K to 7N of the statement of agreed facts up to the point where the papers are stacked and bundled are not subject to tax. They do not agree, and we are not asked to decide, whether sales of machinery used in conveying bundled papers to trucks for distribution are exempt (paragraph 7O).

(A.T.B. Nov. 10, 1975). In 1976, the Commissioner of the Department of Corporations and Taxation issued Technical Information Release 76-3, in effect acquiescing in the *Attleboro Sun* decision but only as applied to "the publishing of newspapers." 4A A. Bailey & W. VanDorn, Taxation 811 (1986).[7]

In view of this background, the 1982 regulations are hardly entitled to the deference we may grant an agency's interpretations of its own enabling statutes, particularly to interpretations made substantially contemporaneously with the enactment of a statute to which the agency consistently has adhered. See *Polaroid Corp.* v. *Commissioner of Revenue,* 393 Mass. 490, 497 (1984). We add that the exemption provisions of § 6 (*r*) and (*s*) place no special burden on a taxpayer seeking to bring itself within their scope. *DiStefano* v. *Commissioner of Revenue,* 394 Mass. 315, 325 (1985).

To answer the second question we must determine the scope of the exemptions provided in § 6 (*r*) and (*s*) for materials and machinery used "directly and exclusively . . . in an industrial plant in . . . the publishing of a newspaper."[8] We need not

---

[7] He said in part in the release: "The Commissioner takes the position that the *Attleboro* decision is limited to the factual circumstances of the case, i.e. the publishing of newspapers and does not extend to other business activities to which subsections (*r*) and (*s*) may apply. The dominant public policy in minimizing the sales and use tax consequences to newspapers, General Laws, Chapter 64H, Section 1(12) (f) and Section 6(m), does not extend to published materials generally, Chapter 64H, Section 1(12) (f). See *Sears Roebuck and Co.* v. *State Tax Commission,* [370 Mass. 127 (1976)]. The position taken by the Board in the *Attleboro* decision is consistent with this public policy."

[8] Each subsection contains the quoted language. Unlike § 6 (*s*), § 6 (*r*) requires that the materials be "consumed" as well as "used" and provides that material is consumed and used "if its normal useful life is less than one year or if its cost is allowable as an ordinary and necessary business expense for federal income tax purposes." Apparently the materials described in paragraphs 7A to 7J of the statement of agreed facts are consumed and used within the meaning of § 6 (*r*).

Each subsection defines an "industrial plant." The commissioner does not claim that the processes described in paragraphs 7A to 7J do not occur in an "industrial plant."

Subsection (*s*) grants an exemption for sales of machinery used in the actual *conversion* or *processing* of tangible personal property, as well as

consider the consequences to nonnewspaper entities of the 1971 amendments to G. L. c. 64H, § 6 (*r*) and (*s*). See *Commissioner of Revenue* v. *Fashion Affiliates, Inc.,* 387 Mass. 543, 545-546 (1982); *Houghton Mifflin Co.* v. *State Tax Comm'n,* 373 Mass. 772, 776 n.5 (1977).

We reject the commissioner's assumption that the exemption for items used in publishing a newspaper is no different from the exemption for items used in manufacturing and commercial printing. We also reject the corollary premise that the exemption for newspaper publishing extends only to items used in "the actual manufacture" or printing of a newspaper. A broad exemption for sales of certain property used in the "publication," and not just in the printing, of a newspaper is consistent with the intent of other provisions in G. L. c. 64H (see, e.g., §§ 1 [12] [*f*], 6 [*m*], 6 [*r*], 6 [*s*] [1984 ed.]) "to free newspapers of a large part of the burden of sales and use taxes." *Sears, Roebuck & Co.* v. *State Tax Comm'n,* 370 Mass. 127, 131 (1976). See *Greenfield Town Crier, Inc.* v. *Commissioner of Revenue,* 385 Mass. 692, 696 (1982).

The question, then, is whether the various processes set forth in paragraphs 7A to 7J of the statement of agreed facts (see the appendix) involve the direct and exclusive use, in an industrial plant, of tangible personal property in the publication of a newspaper. To the extent that the regulations indicate that the sale of tangible personal property used directly and exclu-

---

for sales of machinery used in the actual manufacture of tangible personal property. See *Commissioner of Revenue* v. *Fashion Affiliates, Inc.,* 387 Mass. 543, 544-545 (1982). Subsection (*r*) has no exemption for materials used in the actual conversion or processing of tangible personal property. Before the 1971 amendment, this difference was thought to be insignificant. *Rowe Contracting Co.* v. *State Tax Comm'n,* 361 Mass. 158, 162 (1972). The 1971 amendment may not have affected the basis for that conclusion. See *Commissioner of Revenue* v. *Purity Supreme, Inc.,* 396 Mass. 287, 290-291 (1985), applying an exemption in § 6 (*s*) for machinery used in the actual processing of tangible personal property to recognize an exemption in § 6 (*r*) for materials used in a manufacturing process. The reasoning we use in this opinion supports the result reached in the *Purity Supreme* case. Indeed, the Appellate Tax Board's decision in the *Purity Supreme* case was based on the conclusion that the materials in question were "items of property which are used directly and exclusively in the publishing of a newspaper."

sively in the publication of a newspaper is subject to tax, the regulations are invalid.

The parties have not argued whether specific materials and machinery used in the various production processes fall within the exemption we have just defined. Materials used in the processes described in paragraph 7A (recording events in notebooks and by camera) may not generally be employed in an industrial plant, as defined in § 6 (*r*) and (*s*), and, if so, would not be exempt. Materials and machinery used to provide information for billing and other business purposes and materials and machinery used to process bills (see paragraph 7F [5] and [6]) are not used directly and exclusively in the publishing of a newspaper, as opposed to the operation of a newspaper business, and would not be exempt. Sales of all other material and machinery used in the processes described in paragraphs 7B to 7J of the statement of agreed facts appear to be exempt under either § 6 (*r*) or (*s*).

With the exceptions just stated, we answer the second question in the negative. As we have indicated above, there is no need to answer the first question or to discuss the constitutional issues raised in the third question.

## Appendix.

### Paragraphs 7A to 7J of the Statement of Agreed Facts.

"7. The newspaper production process as employed by the Lowell Sun follows the sequence set forth below:

A.  It begins with the recording of newsworthy events in a reporter's notebook or by a photographer's camera.

B.  The reporter can then either (1) input the story into a computer directly through a video display terminal, or (2) type the story using a typewriter with an optical scanner typeface and using special scanner ready paper and then inputting the story into a computer via an optical scanner.

C.  The photographer develops his or her film in a darkroom and the selected pictures are sent to the composition room for inclusion into the newspaper.

D.  Using video display terminals, editors select, edit and alter typed stories, write headlines, assign typefaces and sizes, set column width and route materials to phototypesetters via the production computer.

E.  Wire service material is simultaneously being received in a number of ways. There are by (1) direct input into computer memory via satellite or telephone lines; (2) by paper tape via telephone lines; (3) by paper printout over telephone lines, and (4) by photo fascimile over telephone lines. This material is also selected, altered and edited by editors using video display terminals.

F.  At the same time, classified line advertising is being created and ad layouts produced. The following procedure is followed:

1.  The terminal operator in the advertising department takes information by phone directly from customer and while customer is on the phone the information is entered on a terminal (xeontron AT 11). There are two categories of information obtained from the customer at this point and entered on the terminal.

    (a) *Header Information* This is information about the customer such as name and address. This information will not appear in the advertisement.

    (b) *Advertisement Data* This is data for the advertisement that will appear in the paper.

2.  The information obtained in 1(a) and 1(b) above is transmitted to the production computer, the production computer then computes the cost of the advertisement based on a per line formula. The cost information then appears on the terminal and the operator gives this information to the customer who is still on the line.

3.  All the data in 1 and 2 above is stored temporarily in the production computer which outputs this information on a floppy disk.

4.  Production information is 'dumped' to the typesetter operation to be incorporated in the advertisement.

5.  Header Information (non-advertisement information) is transferred by the floppy disk to the business office for processing of bills and other Business uses.

6.  Business office computer reads the floppy disk (from 5 above) takes off information and processes bills.

G.  At the same time, display advertising is being created and ad layout produced. The copy for the display advertisements is produced on production department video display terminals or by scanner imput and ad markup computers and then output to the typesetters in much the same manner as news copy. Layout and illustrations for display advertisements are created by Lowell Sun staff artists.

H.  News and advertising copy is then stored in production and advertising copy computers.

I.  By use of video display terminals, copy is corrected, selected for particular editions and assigned to phototypesetters which produce a film positive of news stories and advertising copy. These positives

are then trimmed and pasted up to form a full page including news photos and advertising.

J.  The film positives of both news and advertising copy are then cut into columns. From there, the columns are pasted up around the display advertising into finished pages. The photographs are then added to the page."