JOHANNA SCHULMAN vs. ATTORNEY GENERAL & another[1];
RAYMOND FLYNN & others,[2] interveners.

Suffolk. May 4, 2006. - July 10, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Constitutional Law,* Initiative petition, Amendment of the Constitution.
*Initiative. Marriage.*

In an action challenging the Attorney General's certification, pursuant to art.
48, The Initiative, Part II, § 3, of the Amendments to the Massachusetts
Constitution, as amended by art. 74 of the Amendments, of a petition that,
if successful, would amend the Constitution by providing, prospectively,
that "the Commonwealth and its political subdivisions shall define mar-
riage only as the union of one man and one woman," thereby overruling
the rule of constitutional law announced in *Goodridge* v. *Department of
Pub. Health,* 440 Mass. 309 (2003), this court concluded that the petition
does not constitute a "reversal of a judicial decision" that is excluded from
the initiative process by art. 48, The Initiative, Part II, § 2, of the Amend-
ments to the Massachusetts Constitution. [191-197] GREANEY, J., concur-
ring, with whom IRELAND, J., joined.

CIVIL ACTION commenced in the Supreme Judicial Court for
the county of Suffolk on January 3, 2006.

The case was reported by *Spina,* J.

*Gary D. Buseck (Jennifer L. Levi & Mary L. Bonauto* with
him) for the plaintiff.

*Peter Sacks,* Assistant Attorney General, for the defendants.

[1]Secretary of the Commonwealth.

[2]Philip Travis, Richard Guerriero, Jossie Owens, Roberto Miranda, Richard
Richardson, Bronwyn Loring, C. Joseph Doyle, Kris Mineau, Lura Mineau,
Thomas Shields, and Madelyn Shields filed a motion to intervene in the
county court that was allowed by a single justice.

We acknowledge the amicus briefs submitted by Robert H. Quinn, Philip
Cleary, Dwight G. Duncan, Scott Fitzgibbon, Joseph R. Nolan, and Richard
D. Parker; former Attorneys General of the Commonwealth, professors of law,
and The Massachusetts Lesbian and Gay Bar Association; MassEquality, Mas-
sachusetts Gay & Lesbian Political Caucus, and The Freedom to Marry Coali-
tion of Massachusetts; and C. Francis Tynan.

*Jordan W. Lorence,* of Minnesota (*Dale Schowengerdt,* of Arizona, & *David R. Langdon,* of Ohio, with him) for the interveners.

The following submitted briefs for amici curiae:

*Martin M. Fantozzi & Kevin P. O'Flaherty* for MassEquality & others.

*Luke Stanton* for Robert H. Quinn & others.

*Robert D. Carroll, Christopher C. Nee, & Anna-Marie L. Tabor* for Scott Harshbarger & others.

*C. Francis Tynan,* pro se.

CORDY, J. The plaintiff challenges the Attorney General's certification of an initiative petition that, if successful, would amend the Massachusetts Constitution by providing, prospectively, that "the Commonwealth and its political subdivisions shall define marriage only as the union of one man and one woman." The petition was submitted to the Attorney General for certification pursuant to art. 48, The Initiative, Part II, § 3, of the Amendments to the Massachusetts Constitution (art. 48), as amended by art. 74 of the Amendments. The plaintiff's challenge to the certification was filed in the county court, and was reserved and reported to the full court by a single justice.

The plaintiff's claim is that the proposed amendment, which seeks to overrule the rule of constitutional law announced in *Goodridge* v. *Department of Pub. Health,* 440 Mass. 309 (2003) (due process and equal protection clauses of Massachusetts Constitution bar limiting marriage to heterosexual couples), constitutes the "reversal of a judicial decision" and therefore is excluded from the initiative process by art. 48, The Initiative, Part II, § 2, of the Amendments to the Massachusetts Constitution.[3] We disagree. Neither the plain meaning of the words "reversal of a judicial decision" nor their intended meaning as understood in the context of the Debates of the Constitutional Convention of 1917-1918, from which they

---

[3]In relevant part, art. 48, The Initiative, Part II, § 2, provides: "No measure that relates to . . . the appointment, qualification, tenure, removal, recall or compensation of judges; or to the reversal of a judicial decision; or to the powers, creation or abolition of courts . . . shall be proposed by an initiative petition . . . ."

emerged, supports the broad interpretation of the exclusion pressed by the plaintiff.[4]

1. *Discussion.* The initiative as set out in art. 48, Part I, empowers "a specified number of voters to submit constitutional amendments and laws to the people for approval or rejection," subject to the exclusion of certain matters. See art. 48, Part II, § 2. Measures that relate to "the reversal of a judicial decision" are excluded from the initiative process. *Id.* In interpreting any statutory or constitutional provision, including this exclusion, the starting point of our analysis is its plain language, "the principal source of insight into legislative purpose." *Simon* v. *State Examiners of Electricians,* 395 Mass. 238, 242 (1985), quoting *Commonwealth* v. *Lightfoot,* 391 Mass. 718, 720 (1984). " 'Its words are to be given their natural and obvious sense according to common and approved usage at the time of its adoption,' although the historical context should not 'control[] the plain meaning of the language.' " *Mazzone* v. *Attorney Gen.,* 432 Mass. 515, 526 (2000), quoting *General Outdoor Advertising Co.* v. *Department of Pub. Works,* 289 Mass. 149, 158, appeals dismissed, 296 U.S. 543 (1935), and sub nom. *Brink* v. *Callahan,* 297 U.S. 725 (1936).

The "reversal of a judicial decision" has a specialized meaning in our jurisprudence. It contemplates a peculiarly judicial function, consisting principally of the power to vacate or to set aside the decision in a particular case. See *Loanes* v. *Gast,* 216 Mass. 197, 199 (1913). Where the court vacates or sets aside a decision, the rights of the parties, as previously determined by the same or another court, are affected. It is, at a minimum, this judicial function that the plain language of art. 48 declares off limits to the initiative process, essentially excluding from that process a petition that would permit the citizens to review a decision of the court, and reverse its determination of the rights of the parties.

The "overruling" of the prospective application of a court

---

[4]We decide only the applicability of the "reversal of a judicial decision" exclusion to the proposed initiative petition, as it is the ground raised and argued by the parties before the court. We express no opinion as to whether any other exclusion might apply, including any ground rejected by the Attorney General but not argued here.

decision, by amending the Constitution (or by enacting a new statute) is fundamentally different. Such action does not affect the determination of the rights of the litigants, or the application of the law, made by the court in a particular case, nor does it subject the court's decision to a nonjudicial review. Contrast *Irish-American Gay, Lesbian & Bisexual Group of Boston* v. *Boston*, 418 Mass. 238 (1994), rev'd sub nom. *Hurley* v. *Irish-American, Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995) (judgment of Supreme Judicial Court affirming entitlement of group of gay, lesbian, and bisexual descendants of Irish immigrants to march in privately organized parade reversed by United States Supreme Court on First Amendment grounds). The underlying substantive law is simply changed to reflect the present intentions of the people, and that new law will be applied thereafter in any subsequent case or cases.

While it is not uncommon for this court to "reverse" decisions made in the lower courts, we have also, on occasion, "overruled" prior decisions interpreting the Constitution,[5] a statute,[6] or a common-law principle.[7] When we have done so,

---

[5]See, e.g., *Callahan* v. *First Congregational Church of Haverhill*, 441 Mass. 699, 708-709 (2004) (holding that congregational as well as hierarchical churches have autonomy in regard to church issues; "[a]ny language suggesting the contrary in *Antioch Temple, Inc.* v. *Parekh*, [383 Mass. 854, 865 (1981)], is overruled"); *Stonehill College* v. *Massachusetts Comm'n Against Discrimination*, 441 Mass 549, 552, cert. denied sub nom. *Wilfert Bros. Realty Co.* v. *Massachusetts Comm'n Against Discrimination*, 543 U.S. 979 (2004) (holding that employers who have been found to have committed discriminatory acts are only allowed administrative review of decision and overruling in part constitutional ruling in *Lavelle* v. *Massachusetts Comm'n Against Discrimination*, 426 Mass 332 [1997]). See also *Commonwealth* v. *Pagan*, 445 Mass. 161, 170 (2005) (overruling Appeals Court's interpretation of art. 12 "excusing indictment as a repeat offender when the predicate convictions expose the defendant to a higher mandatory minimum sentence, but the same maximum").

[6]See, e.g., *Commonwealth* v. *McCourt*, 438 Mass. 486, 496 n.12 (2003) (overruling interpretation of Commonwealth's rape statute, G. L. c. 265, § 22, that subsequent acts could not be considered in determining elements of "aggravated rape"); *Sullivan* v. *Burkin*, 390 Mass. 864, 870-872 (1984) (citing changes in public policy, court overruled *Kerwin* v. *Donaghy*, 317 Mass. 559, 571 [1945], and held that it would treat assets of inter vivos trust as part of "estate of the deceased" under G. L. c. 191, § 15); *Silverblatt* v. *Livadas*, 340 Mass. 474, 475-478 (1960) (overruling *Engel* v. *Thompson*, 336 Mass. 529 [1957], and holding that omission of words "or suffered" was significant in evaluating quitclaim deed under G. L. c. 183, § 17).

[7]See, e.g., *Powers* v. *Wilkinson*, 399 Mass. 650, 661-662 (1987) (overruling

however, we have not "reversed" those decisions, in the sense of stripping from the parties the determinations made in their cases.[8] Rather, we have merely removed or altered the precedential or prospective effect of the decisions. This power is not peculiarly judicial, and has been exercised legislatively on many occasions.[9]

From this perspective, it is apparent that the plain language of art. 48 does not bar the people from using the initiative process to amend the Constitution prospectively, thereby changing the substantive law to be applied and effectively "overruling" the precedential effect of a prior court decision interpreting it, because such an amendment does not constitute the "reversal of a judicial decision," as we have understood the meaning of those words.[10]

Delving into the historical context from which the language

---

common-law rule of construction of term "issue" as excluding nonmarital children); *Diaz* v. *Eli Lilly & Co.*, 364 Mass. 153, 166 (1973) ("In a field long left to the common law, change may well come about by the same medium of development").

[8]Some cases, particularly those involving the constitutional rights of defendants in criminal matters, may be applied retrospectively to prior cases involving different parties. See, e.g., *Subilosky* v. *Commonwealth*, 349 Mass. 484 (1965) (*Gideon* v. *Wainwright*, 372 U.S. 335 [1963], applied retroactively). The retrospective application of the proposed amendment is not an issue in this case.

[9]Examples of legislative action overruling court precedent include *Ciardi* v. *F. Hoffmann-La Roche, Ltd.*, 436 Mass. 53, 72 (2002) (detailing Legislature's expansion of consumers' causes of action); *North Shore Realty Trust* v. *Commonwealth*, 434 Mass. 109, 115 (2001) (explaining that Legislature overruled court by rewriting G. L. c. 79, § 37, to allow interest awards against Commonwealth); and *Lowell Sun Publ. Co.* v. *Commissioner of Revenue*, 397 Mass. 650, 653 (1986) (detailing Legislature's reaction to decision finding tax exemptions for fully integrated printing businesses).

[10]The subject matter of the proposed amendment may otherwise lead to its exclusion from the initiative process on a different ground, including its being "inconsistent with" various important individual rights enumerated in art. 48: "The right to receive compensation for private property appropriated to public use; the right of access to and protection in courts of justice; the right of trial by jury; protection from unreasonable search, unreasonable bail and the law martial; freedom of the press; freedom of speech; freedom of elections; and the right of peaceable assembly." Article 48 also excludes from the initiative process any measure that "relates to religion, religious practices or religious institutions." No such grounds have been raised or argued by the parties in this case.

of the exclusion emerged affords no further assistance to the plaintiff. We previously have had occasion to consider the meaning of the exclusion in that context. In *Mazzone* v. *Attorney Gen.*, *supra* at 517, the court addressed a number of challenges to the Attorney General's certification of an initiative petition that proposed a new law regarding the expansion of "the scope of the commonwealth's drug treatment program" and "the forfeiture of assets used in connection with drug offenses." One of those challenges was that the proposed law fell within the "reversal of a judicial decision" exclusion, because the petition, as worded, "might have the effect of reversing a trial judge's 'final order' regarding an asset forfeiture." *Id.* at 525.

In ruling that the art. 48 exclusion did not apply, the court turned to the debates on the constitutional convention of 1917-1918, regarding the Initiative. 2 Debates in the Massachusetts Constitutional Convention 1917-1918 (1918). The court noted that the "reversal of a judicial decision" exclusion, as well as other exclusions relating to "the appointment [and] tenure . . . of judges" and "the powers, creation or abolition of courts," were intended to secure the continued independence of the judiciary, and, in particular, the power of the Supreme Judicial Court to declare statutes unconstitutional, without the fear of reprisals from the people. *Mazzone* v. *Attorney Gen.*, *supra* at 525-528. By further examining the specific meaning that the word "reversal" was intended to convey, the court noted that the original language used in the debates was "recall," and that the word had been changed to "reversal" during editing, but that the change did not intend any change in meaning. *Id.* at 527 n.12. The court then noted that it was "clear that the delegates understood the phrase [recall] to refer to Theodore Roosevelt's controversial 1912 proposal by that name." *Id.* at 527. "As used by Mr. Roosevelt, the phrase described the situation in which a State court sets aside a statute as unconstitutional and the people are given the opportunity to reinstate the same law, notwithstanding the court's declaration of its unconstitutionality." *Id.* at 527-528.[11]

The *Mazzone* court concluded that by excluding petitions that

---

[11]That the members of the constitutional convention would have been familiar with Theodore Roosevelt's "recall" proposal is evident. In 1914, two

relate to the "reversal of a judicial decision," "the constitutional convention intended no more than to prevent a statute, declared unconstitutional by a State court, from being submitted to the people directly and thereby reenacted notwithstanding the court's decision." *Id.* at 528. "Citizens may overrule a decision based on State constitutional grounds, but may do so only by constitutional amendment." *Id.* The court pointed out that an interpretation that would exclude from the initiative process petitions for amendments related to laws that a court had already applied, if the enactment of the amendments might result in a different decision in the future, "would effectively eviscerate the popular initiative" envisioned in art. 48. *Id.*[12]

The court's conclusion in the *Mazzone* decision that art. 48, even with its exclusions, permits the people to petition for a constitutional amendment overruling a decision based on State constitutional grounds, accurately reflects the tenor of the debates on this point. In those debates, the chairman of the Committee on Initiative and Referendum, John W. Cummings, of Fall River, spoke in favor of the initiative, explaining that the need for the initiative process was driven by the lack of action on the part of the General Court in amending laws and the Constitution in the face of decisions of the Supreme Judicial Court striking down worker protection statutes (as violative of

resolves were introduced in the General Court proposing a constitutional amendment that would provide for the "Recall of Judicial Decisions." The proposed amendments set out an expedited process by which a statute declared unconstitutional could, by petition, be put on the ballot at the next State election with the question, "Shall the proposed act have the force and effect of law?" Neither proposal received favorable action. 1914 House Doc. No. 186. 1914 House Doc. No. 1106. In addition, the book, Ransom, Majority Rule and the Judiciary (1912), in which Roosevelt's recall proposal was described, was specifically referenced in the debates.

[12]We subsequently cited the *Mazzone* reasoning favorably in *Albano* v. *Attorney Gen.*, 437 Mass. 156 (2002), a case involving an art. 48 petition very similar to the one at issue here. In that case (decided prior to our decision in *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309 [2003]), we reiterated that "[t]he initiative process permits the people to petition for a constitutional amendment that overrules a court decision when the court has declared a statute to be in violation of our Constitution," *Albano* v. *Attorney Gen.*, *supra* at 160, and ruled that an initiative petition to amend the Constitution to provide that "only the union of one man and one woman shall be valid or recognized as a marriage in Massachusetts" did not violate art. 48's exclusion of matters "relat[ing] to the powers of the courts." *Id.* at 157.

the Constitution's due process clause), and adopting common-law principles (such as the "fellow-servants doctrine") that placed extraordinary burdens on workers and their families. 2 Debates, *supra* at 595-597 (remarks of Mr. Cummings). He specifically noted that the distrust among workers engendered by these decisions was not so much directed to the court, where "they seemed to take it for granted that they should accept the law as [the court] found it"; rather, it was directed at the Legislature, which made no attempt to relieve them of the burdens thereby created. *Id.* at 597 (remarks of Mr. Cummings). It was the initiative process that would now afford an alternative avenue for such relief if faced with an recalcitrant Legislature.

Notably, it was also Mr. Cummings who proposed the judicial exclusions to the initiative, including the exclusion of matters relating to the "recall [or reversal] of judicial decisions." *Id.* at 789. As the principal proponent of these exclusions, Mr. Cummings was called on to answer many questions about their scope. *Id.* at 789-795. In doing so, he explained that the exclusions were intended to protect the independence of the judiciary, by ensuring that the Justices were not subjected to unjust criticisms and drawn into political debates "to defend themselves or their decisions." *Id.* at 790. Disagreements about what the law should provide could be accommodated by the initiative process (not the "recall" process), where "if the courts declare a law unconstitutional we have the power to expand the Constitution and reenact the law and make it constitutional." *Id.* at 791. In this way, public debate would more properly be focused on whether some laws, or the Constitution, ought to be amended to conform with the current expectations and wishes of the people, and not on the legal correctness of previous judicial decisions interpreting them.

In sum, the plain meaning of the words "reversal of a judicial decision" does not include the concept of "overruling" the prospective or precedential effect of a decision by an amendment to the Constitution or by the enactment of a new statute. The debates further confirm that the "reversal of judicial decision" exclusion was not intended to preclude such an amendment (or enactment), so long as its subject matter was not barred

by other important exclusions not at issue in this case. See note 10, *supra.*

2. *Conclusion.* There was no error in the Attorney General's certification of the petition. We remand the case to the county court for entry of a judgment declaring that the Attorney General's certification of the petition is in compliance with the requirements of art. 48.

*So ordered.*

GREANEY, J. (concurring, with whom Ireland, J., joins). The parties have argued this case *solely* on the meaning of the word "reverse" in the context of the debates that took place during the adoption of the initiative process for constitutional amendments. Although the matter is not free from some doubt, I agree that the word "reverse" has a meaning that differs from the word "overrule"; that the difference was established at the time of the constitutional convention of 1917-1918; and, consequently, that the voters who ratified art. 48, The Initiative, Part II, § 3, of the Amendments to the Massachusetts Constitution, are deemed to have been aware of the difference. The Attorney General expresses in his brief (on the only ground argued) the essential difference, as it relates to this case, as follows: "[A]mending the constitution to prohibit same-sex marriage prospectively would not imply that *Goodridge* [v. *Department of Pub. Health,* 440 Mass. 309 (2003),] was wrongly decided [but would instead adopt] a new constitutional rule in place of the one announced in that case." The ballot question, therefore, can go forward for the reasons stated by the court. See *Albano* v. *Attorney Gen.,* 437 Mass. 156, 159-160 (2002).

A positive vote enacting the initiative, however, might not be the end of the story. In *Goodridge* v. *Department of Pub. Health, supra* at 341-342, we held:

"The marriage ban works a deep and scarring hardship on a very real segment of the community for no rational reason. The absence of any reasonable relationship between, on the one hand, an absolute disqualification of same-sex couples who wish to enter into civil marriage and, on the other, protection of public health, safety, or

general welfare, suggests that the marriage restriction is rooted in persistent prejudices against persons who are . . . homosexual. 'The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.' *Palmore* v. *Sidoti*, 466 U.S. 429, 433 (1984) . . . . Limiting the protections, benefits, and obligations of civil marriage to opposite-sex couples violates the basic premises of individual liberty and equality under the law protected by the Massachusetts Constitution."

There can be no doubt after the *Goodridge* decision that the Massachusetts Constitution protects the right of a couple who wish to marry, and are otherwise eligible to marry, to obtain a marriage license, regardless of gender. It is equally clear that the proposed initiative is directed toward withdrawing this right from a distinct segment of our community, thereby prohibiting, as matter of constitutional law, same-sex couples from committing to civil marriage and from attaining the multitude of legal rights, and financial and social benefits, that arise therefrom. The proposed initiative cannot be said to further a proper legislative objective (as was categorically decided by the *Goodridge* court, there is none[1]). The only effect of a positive vote will be to make same-sex couples, and their families, unequal to everyone else; this is discrimination in its rawest form. Our citizens would, in the future, be divided into at least three separate and unequal classifications: heterosexual couples who enjoy the right to marry; same-sex couples who were married before the passage of the amendment (but who, if divorced, would not be permitted to remarry someone of the same sex); and same-sex couples who have never married and, barring the passage of another constitutional amendment on the subject, will be forever denied that right.

There is no Massachusetts precedent discussing, or deciding, whether the initiative procedure may be used to add a constitu-

---

[1]The parties agree that voters have no power to pass on the validity of what was stated by this court in *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309 (2003), because doing so would be tantamount to a "reversal of a judicial decision."

tional provision that purposefully discriminates against an oppressed and disfavored minority of our citizens in direct contravention of the principles of liberty and equality protected by art. 1 of the Massachusetts Declaration of Rights. This basis for noncertification was not argued to the Attorney General when he considered validity of the initiative, nor has it been raised by any of the parties in their briefs. See *ante* at 191 n.4. Put more directly, the *Goodridge* decision may be irreversible because of its holding that no rational basis exists, or can be advanced, to support the definition of marriage proposed by the initiative and the fact that the *Goodridge* holding has become part of the fabric of the equality and liberty guarantees of our Constitution. If the initiative is approved by the Legislature and ultimately adopted, there will be time enough, if an appropriate lawsuit is brought, for this court to resolve the question whether our Constitution can be home to provisions that are apparently mutually inconsistent and irreconcilable.[2] We may then give careful consideration, in view of what has been said above, to the legal tenability and implications of embodying a provision into our Constitution that would look so starkly out of place in the Adams Constitution, when compared with the document's elegantly stated, and constitutionally defined, protections of liberty, equality, tolerance, and the access of all citizens to equal rights and benefits.[3]

---

[2]This approach honors the principle that issues not briefed and argued should not be decided, especially when a question of constitutional law, that may become moot, is involved, and the approach respects the roles of the Legislature and the people in the initiative process.

[3]A positive vote on the proposed initiative may be vulnerable on grounds of Federal constitutional law as well. See *Romer* v. *Evans*, 517 U.S. 620, 633 (1996) (striking down constitutional amendment to Colorado Constitution purporting to withdraw protection of State's antidiscrimination statutes from homosexuals on grounds that amendment created unequal classifications of citizenry and impermissibly barred those seeking to resolve inequality from traditional political process). See also *Reitman* v. *Mulkey*, 387 U.S. 369, 373 (1967) (affirming judgments of Supreme Court of California holding that State constitutional amendment initiative erasing statutory protection against racial discrimination in housing denied equal protection of laws under Fourteenth Amendment to the United States Constitution). Whether the substantive due process or equal protection guarantees of the Federal Constitution permit an amendment to a State Constitution that is motivated by animus, or is discriminatory on its face without a sufficiently important reason, are, at this point in time, unlitigated questions of law.